**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ARMIDA L. COSTA,⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀NO. CV 17-3934-E
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀**MEMORANDUM OPINION**
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
NANCY A. BERRYHILL, Deputy⠀⠀)⠀⠀**AND ORDER OF REMAND**
Commissioner for Operations,⠀)
Social Security,⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀)
_____)

⠀⠀⠀⠀Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS
HEREBY ORDERED that Plaintiff's and Defendant's motions for summary
judgment are denied, and this matter is remanded for further
administrative action consistent with this Opinion.

**PROCEEDINGS**

⠀⠀⠀⠀Plaintiff filed a complaint on May 25, 2017, seeking review of
the Commissioner's denial of benefits.  The parties consented to
proceed before a United States Magistrate Judge on August 2, 2017.
Plaintiff filed a motion for summary judgment on December 11, 2017.

Defendant filed a motion for summary judgment on February 23, 2018. The Court has taken the motions under submission without oral argument. See L.R. 7-15; "Order," filed June 5, 2017.

**BACKGROUND**

Plaintiff asserts disability since September 29, 2011, based on, inter alia, fibromyalgia, degenerative disc disease of the lumbar spine, cervical radiculopathy, knee arthritis, elbow medial and lateral epicondylitis, sciatica, tendonitis, myofascial tender points, gastroesophageal reflux disease ("GERD"), insomnia, depression, and tenosynovitis of the hand and wrist (Administrative Record ("A.R.") 18, 333-35, 383-84). Dr. Allen Salick and Dr. Veena Rao, two of Plaintiff's treating rheumatologists, diagnosed fibromyalgia and opined that Plaintiff's resulting physical limitations disable her from all employment.[1] Dr. Tong Jiang, who treated Plaintiff for her migraines, opined that Plaintiff would likely miss between two to four

///
///
///
///

---

[1] Dr. Salick completed evaluation forms dated August 15, 2013 (A.R. 1610-13). Dr. Salick opined, inter alia, that Plaintiff could sit a total of three hours in an eight-hour day, and stand and walk a total of three hours in an eight-hour day, and could carry five pounds frequently and 10 pounds occasionally (A.R. 1610-11). Dr. Rao completed evaluation forms dated August 21, 2013, finding the same sitting, standing/walking, and lifting limitations Dr. Salick had found (A.R. 1615-18). The vocational expert testified that, if a person were limited as Drs. Salick and Rao opined, that person could not perform any work (A.R. 98).

work days a month due to her symptoms, which would also be disabling (A.R. 2416-17, 2669-70, 2776-77).[2]

In 2014, an Administrative Law Judge ("ALJ") issued an unfavorable decision (A.R. 119-30).  The Appeals Council granted review and remanded the case to an ALJ for further proceedings (A.R. 137-39).

On remand, a different ALJ reviewed the record and heard evidence from Plaintiff and a vocational expert (A.R. 18-36, 45-72).  In 2016, this ALJ found that Plaintiff has "severe" fibromyalgia, degenerative disc disease of the lumbar spine, anxiety, depression, irritable bowel syndrome ("IBS"), migraine headaches, and temporomandibular joint disorder ("TMJ") (A.R. 21).[3]  The ALJ found Plaintiff capable of performing a limited range of light work (i.e., limited to: (1) standing and/or walking only four hours in an eight-hour day; (2) occasional stooping, kneeling, crouching, and crawling; (3) avoiding concentrated exposure to temperature extremes and industrial hazards; and (4) no work exceeding a Specific Vocational Preparation ("SVP") level of 4; and (5) no work in bright sunlight).  See A.R. 23-24; see also A.R. 108-10, 113 (state agency physician's June, 2013 physical residual functional capacity assessment limiting Plaintiff to light

_____

[2]     A vocational expert testified that if a person missed two to four days of work per month secondary to migraines there would be no work that person could perform (A.R. 98-99).

[3]     The ALJ failed to discuss why the ALJ did not find Plaintiff's alleged knee arthritis, elbow medial and lateral epicondylitis, and tenosynovitis of the hand and wrist to be "severe" impairments.  See A.R. 21.

work with restrictions (1) through (3) above, but describing Plaintiff's residual functional capacity as demonstrating a maximum sustained work capacity for sedentary work). The ALJ identified certain sedentary and light jobs Plaintiff assertedly could perform, and, on that basis, denied disability benefits (A.R. 35-36 (adopting vocational expert testimony at A.R. 67-68)). The Appeals Council denied review (A.R. 1-3).

**STANDARD OF REVIEW**

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards. See Carmickle v. Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue, 499 F.3d 1071, 1074 (9th Cir. 2007); see also Brewes v. Commissioner, 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and quotations omitted); see also Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ. But the Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. Rather, a court must consider the record as a whole,

///

weighing both evidence that supports and evidence that
detracts from the [administrative] conclusion.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and
quotations omitted).

**DISCUSSION**

Plaintiff contends, _inter alia_, that substantial evidence does
not support the ALJ's residual functional capacity determination.  See
Plaintiff's Motion, pp. 5-10.  The Court agrees.

**I.    Summary of the Relevant Medical Record**

Plaintiff testified that she stopped working because she was
experiencing a lot of pain which made it hard for her to lift, move,
drive, and use her hands, she was having panic attacks, daily stomach
pain, migraines and tension headaches that lasted from four to 72
hours, she was having difficulty with her memory and concentration,
and she felt she could not function anymore (A.R. 53-56, 83; _see
also_ A.R. 397 (reporting pain limits)).  As detailed below, Plaintiff
saw a number of doctors who treated her for various medical
///
///
///
///
///
///

conditions throughout the period of alleged disability.[4]  All of the
treating doctors who opined regarding Plaintiff's capacity indicated
that Plaintiff was more limited than the ALJ found.


**A.   <u>Plaintiff's Worker's Compensation Treating Physicians'
    Records</u>**


Worker's compensation physician Dr. Nicole Pham-Baily treated
Plaintiff from August of 2011 through at least July of 2012 (A.R. 629-
36, 736-40, 777-84, 795-802, 1198-1201).  Plaintiff complained of
bilateral elbow and neck pain from repetitive typing, as well as upper
back pain, shoulder pain, forearm pain, wrist pain, hand pain and
tension headaches (A.R. 737, 796-97).[5]  On examination in May of 2012,
Dr. Pham-Baily had noted depression, anxiety, slumped posture,
cervical/thoracic spine spasm, some limited range of motion, bilateral
upper extremity motor strength of 4/5 with "poor effort," shoulder
spasm, painful range of motion in her shoulders, shoulder strength of

---

[4]    The Court has not summarized records from Dr. Jennifer
Chan who treated Plaintiff for gastrointerology issues.  Dr. Chan
did not opine whether Plaintiff had any work-related limitations.
<u>See</u> A.R. 1450-53, 1635-38, 1711-14, 1769-73, 1951-54, 2412-13
(Dr. Chan's records).  Nor has the Court summarized Plaintiff's
mental health records which included psychiatric treatment.  <u>See,
e.g.</u>, A.R. 1619-29, 2143-84, 2761 (Dr. David Friedman's
psychiatric records).  In September of 2013, Dr. Friedman opined
that Plaintiff would have moderate to marked limitations in
understanding and memory, sustained concentration and
persistence, social interaction, and adaptation (A.R. 1627-29).
A state agency physician had found that Plaintiff could
understand and carry out one to two step instructions and should
avoid public contact (A.R. 110-14).

[5]    Prior to August of 2011, the records contain treatment
notes for cervical radiculopathy, lateral and medial
epicondylitis, and sciatica (A.R. 802-04, 1025, 1031-32).

4/5 in her left shoulder, tenderness and painful range of motion in her elbows, bilateral elbow motor strength of 4/5 with "poor effort," and tenderness in her wrists with decreased grip strength with "poor effort" (A.R. 630-31; see also 738-39, 798-99 (similar findings on prior examinations)).[6] Dr. Pham-Baily diagnosed: (1) probable left cervical radiculopathy and chronic left C4-C5 mild disc protrusion; (2) chronic neck and shoulder strain, right greater than left; (3) arm/forearm strain from repetitive use; (4) tendonitis in her hands; (5) bilateral muscle spasm of the thoracic area of the back; and (6) probable right lumbar radiculopathy and chronic right L4-L5 disc protrusion/bulge with chronic lumbar sprain or strain (A.R. 632, 799-800). Dr. Pham-Baily treated Plaintiff with physical therapy, acupuncture, and medications including Hydrocodone (A.R. 633, 800-01).[7]

In August of 2011, Dr. Pham-Bailey opined that Plaintiff would have limited use of her hands at work, including lifting, carrying, pushing, and pulling no more than five pounds (A.R. 801). In

---

[6]     A November, 2011 MRI study of Plaintiff's lumbar spine showed an annular tear at L4-L5. See A.R. 729-31 (interpreting same as causing lumbosacral radiculopathy). A March, 2012 MRI study of Plaintiff's cervical spine showed mild C4-C5 left paracentral disk bulge (A.R. 631-32). Nerve conduction studies from May of 2012 were normal (A.R. 633-35).

[7]     The record contains many treatment notes for physical therapy and acupuncture throughout the period of alleged disability. See, e.g., A.R. 717-18, 731-33, 754-59, 944-78, 1132-34, 1180-81, 1185-86, 1223-25, 1229-30, 1340-43, 1365-66, 1389-90, 1506-08, 1565-92, 1762-65, 1833-34, 1848-49, 1881-85, 1910-12, 1916-18, 1929-32, 1987-90, 2072-73, 2202-05, 2247-50, 3257-65, 3294-98, 3345-49, 3353-57, 3360-64, 3390-92, 3408-11 (physical therapy records); A.R. 772-74, 1085-86, 1725-32 (acupuncture records).

September of 2011, Dr. Pham-Bailey opined that Plaintiff should lift and carry no more than 15 pounds (A.R. 784). In October and November of 2011, Dr. Pham-Bailey opined that Plaintiff should lift and carry no more than five pounds and push and pull no more than 15 pounds (A.R. 753, 771). From March of 2012 through at least July of 2012, Dr. Pham-Bailey opined that Plaintiff had very limited use of her hands, and was precluded from gripping and lifting any weight. <u>See</u> A.R. 544, 548-49, 636; <u>see also</u> A.R. 576 (opining that Plaintiff is unable to work due to pain in her hands after working less than one hour, inability to concentrate, and chronic diarrhea); <u>but see</u> A.R. 583 (opining in March, 2012 form that Plaintiff was limited to lifting, carrying, pushing, or pulling no more than 10 pounds).

Rheumatologist Dr. Allen Salick treated Plaintiff from September of 2012 through at least August of 2013 (A.R. 845-73, 1603-09). Dr. Salick prepared a lengthy consultation and permanent and stationary report dated September 20, 2012 (A.R. 845-73). Plaintiff reported a history of body pain along with anxiety, depression, headaches, heartburn, acid reflux, diarrhea, constipation, sleep disorder and fatigue since July of 2009, and said she had been diagnosed with fibromyalgia in March of 2012 (A.R. 846-47, 849). Plaintiff reported having difficulty with activities of daily living due to pain and fatigue, an inability to sit more than 30 minutes or walk and stand more than 30 minutes without an increase in pain, and difficulty grasping, gripping, lifting, carrying, twisting, bending, stooping, squatting, or performing physical activities (A.R. 850). Plaintiff complained of, <u>inter alia</u>, "significant" migraine headaches and dizziness, weight loss, shortness of breath, panic attacks, symptoms

associated with irritable bowel syndrome, sensitivity to cold weather
and air conditioning, difficulty with concentration, thinking,
focusing, memory, and following directions, non-restorative sleep,
fatigue, depression, and anxiety (A.R. 851-54).

On examination, Plaintiff reportedly had 18/18 positive tender
points, normal ranges of motion with no atrophy, grip strength testing
of 25 pounds on the right side and 40 pounds on the left side, normal
electrodiagnostic studies, and normal blood and urinalysis laboratory
studies (A.R. 854-60; see also A.R. 874-904 (laboratory findings and
Plaintiff's self-reports regarding pain and other symptoms provided to
Dr. Salick)).[8] Dr. Salick diagnosed fibromyalgia, stating that
Plaintiff presented with "classic" symptoms fulfilling the 1990
American College of Rheumatology Criteria for diagnosis of
fibromyalgia syndrome, and showing a number of symptoms correlating
with the Revised 2010 Fibromyalgia Criteria.  See A.R. 860; see also
A.R. 861-67 (Dr. Salick explaining the American College of
Rheumatology fibromyalgia criteria); A.R. 2858-68 (Dr. Salick's
October, 2014 disability evaluation again explaining how Plaintiff met
the criteria for fibromyalgia); Social Security Ruling 12-2P at *2
(Evaluation of Fibromyalgia; criteria for diagnosis are based on the
same criteria from the American College of Rheumatology followed by
Dr. Salick).

///

///

-----

[8]Physical therapy records from 2011, 2012, and 2013 show
grip strengths within normal limits on the three occasions tested
(A.R. 945, 952, 967).

Dr. Salick opined that Plaintiff had reached the point of "maximal medical improvement" (i.e., her condition was "well stabilized and unlikely to change substantially in the next year with or without medical treatment") (A.R. 868). Dr. Salick opined that Plaintiff could not return to her past work (A.R. 871). Dr. Salick prepared monthly progress reports for Plaintiff from March of 2013 through March of 2014 and from August of 2014 through April of 2016 recommending that Plaintiff remain off work (A.R. 2102-17, 2127-28, 2844-57, 2869-70, 3502-11).

Dr. Salick completed a "Physical Capacities Evaluation" form, a "Physical Effects of Pain" form, and a "Mental Effects of Pain" form dated August 15, 2013 (A.R. 1610-13). Dr. Salick indicated that Plaintiff should be limited to sitting a total of three hours in an eight-hour day, and standing/walking a total of three hours in an eight-hour day, with the opportunity to alternate sitting and standing (A.R. 1610). Dr. Salick indicated that Plaintiff could not use her hands "adequately" for simple grasping, pushing and pulling or fine manipulation, or use her hands for repetitive motion tasks (A.R. 1610). Dr. Salick opined that Plaintiff could frequently lift up to five pounds and occasionally lift up to 10 pounds, and could occasionally climb, balance, stoop, and reach above shoulder level, but could never kneel, crouch, or crawl (A.R. 1611). He indicated that Plaintiff would have total preclusion from working at unprotected heights, would have "severe" restriction in "[b]eing around moving machinery," and would have "moderate" restriction in "[e]xposure to marked changes in temperature or and humidity," "[d]riving automotive equipment," and "[e]xposure to dust, fumes, and gases" (A.R. 1611).

Dr. Salick indicated that Plaintiff suffers from disabling fatigue
(A.R. 1611). Dr. Salick also indicated that Plaintiff suffers from
disabling pain related to her fibromyalgia syndrome (A.R. 1612).

**B.** **Additional Rheumatology Treatment Records**

Plaintiff was referred by a pain management doctor for a
rheumatology consultation regarding the source of Plaintiff's pain
(A.R. 744-49). In November of 2011, Plaintiff presented to Dr. Rao
for an initial rheumatology consultation, complaining of knee and back
pain with a history of neck strain, shoulder strain, tendonitis in her
hand, strain in her arm/forearm from repetitive use, and a history of
right knee arthroscopy with meniscectomy (A.R. 733-34). On
examination, Plaintiff reportedly had tenderness to palpation ("+TTP")
over her back paraspinal muscles and crepitus in her knees with
flexion and extension (A.R. 735). Imaging of her knees showed minimal
joint space narrowing (A.R. 735).[9] Dr. Rao assessed neck and low back
pain, elbow tendonitis, and bilateral knee pain secondary to mild

///

---

[9] In September of 2011, Plaintiff had complained of right
knee pain and was diagnosed with lumbosacral radiculopathy and
knee pain (A.R. 1077, 1094-95). Bilateral knee x-rays showed
mild degenerative changes in the right knee, bone spurs, and
joint space narrowing bilaterally as seen in moderate arthritis
(A.R. 1077, 1096). Plaintiff had another knee consultation in
April of 2013 and was diagnosed with knee joint pain (A.R. 1474-
78).

In May of 2013, Plaintiff presented to Dr. Joseph Faustgen
for a second opinion regarding her right knee pain (A.R. 1778).
On examination, Plaintiff reportedly had tenderness and limited
range of motion (A.R. 1779-80). Dr. Faustgen recommended a
second right knee arthroscopy (A.R. 1780-81).

osteoarthritis, and recommended injecting Plaintiff's right knee with
depomedrol (A.R. 736).

In March of 2012, Dr. Nazanin Firooz examined Plaintiff and
diagnosed fibromyalgia, noting Plaintiff had a tender lumbar spine and
18 of 18 fibromyalgia tender points (A.R. 538-40).  Plaintiff
complained of severe pain in her low back and knees, migratory
feelings of "electricity" shooting up and down her body, poor sleep,
stress, abdominal discomfort, diarrhea, constipation, intermittent
headaches, and fatigue (A.R. 540).  Dr. Firooz indicated that
Plaintiff also had osteoarthritis ("OA") of the knees and degenerative
joint disease ("DJD") of the lumbar spine but said that Plaintiff's
symptoms were "out of proportion" to the x-ray findings (A.R. 539-40;
see also A.R. 774-77 (orthopedic visit from September of 2011
reviewing knee x-ray findings)).  Dr. Firooz characterized Plaintiff's
symptoms as consistent with fibromyalgia (A.R. 539-40).

Plaintiff returned to Dr. Rao for regular rheumatology treatment
from May of 2012 through at least April of 2016 (A.R. 605-07, 619-21,
636-38, 1466-67, 1647-50, 1703-04, 1937-38, 1959-60, 2218-20, 2437-39,
3150-52, 3307-09, 3589).  Dr. Rao stated that Plaintiff's fibromyalgia
was "active but overall stable" and "not optimally controlled" (A.R.
638, 3308-09).  Over the course of her treatment, Plaintiff continued
to complain of body pain, fatigue, jaw/TMJ pain, depression, and
memory issues (A.R. 620, 1466, 1647-48, 1703, 1937, 2218, 3151, 3307).

Dr. Rao prescribed fibromyalgia medication, physical therapy,
exercise, stress reduction, proper sleep, and acupuncture (A.R. 605,

607, 638, 1650, 1938, 2220, 3152, 3587-89).  In January of 2013, Dr.
Rao also referred Plaintiff for a spine injection for continuing low
back pain (A.R. 605, 607).  In August of 2013, Dr. Rao added Tramadol
for Plaintiff's pain (A.R. 1704).  In January of 2014, Dr. Rao
injected Plaintiff's elbows with depomedrol for bilateral lateral
epicondylitis (A.R. 1959-60).  In June of 2014, Dr. Rao gave Plaintiff
more elbow injections for pain (A.R. 2437-39).  In June of 2015,
Plaintiff returned to Dr. Rao complaining of ongoing low back pain and
noting she would be having an epidural injection in a week (A.R. 3151;
see also A.R. 3170-75 (records from lumbar spine epidural)).

On August 21, 2013, Dr. Rao completed the same evaluation forms
that Dr. Salick had completed (A.R. 1615-18).  Dr. Rao found the same
limitations Dr. Salick had found, except Dr. Rao indicated that
Plaintiff could use her hands for simple grasping (A.R. 1615-18;
compare A.R. 1610-13).

C.    **Pain Management Treatment Records**

Dr. Daniel Tongbai was Plaintiff's pain management doctor from
May of 2012 through at least April of 2016 (A.R. 639-44, 719-23, 1685-
90, 1966-72, 2478-84, 3431-38).  Plaintiff initially complained of
pain in her neck, back, legs, elbows, and knees (A.R. 640-41).  Dr.
Tongbai reviewed the November, 2011 lumbar spine MRI showing an
annular tear at L4-L5 (A.R. 640-41).

Dr. Tongbai assessed pain most likely resulting from the L4-L5
tear and fibromyalgia (A.R. 643).  Dr. Tongbai prescribed medication,

TENS therapy, and stated Plaintiff should follow up for an epidural steroid injection if her pain continued (A.R. 644, 1689-90; <u>see also</u> A.R. 723 (treatment note from December of 2011 also mentioning possibility of future epidural injections if Plaintiff's pain did not resolve)). Reportedly, Plaintiff had been given knee, shoulder, and hip injections with limited benefit and still had significant pain in those areas despite the injections (A.R. 644, 1690). Dr. Tongbai indicated that Plaintiff's fibromyalgia, which assertedly affected her whole body, resulted in a degree of pain not in proportion to lumbar spine MRI findings from November of 2011 (A.R. 1689). According to Dr. Tongbai, epidural steroid injections may provide only temporary relief and would not treat the Plaintiff's other symptoms (A.R. 1689). Dr. Tongbai opined that Plaintiff needed to get her fibromyalgia under control or any epidural injections would not be as effective (A.R. 644, 1690).

In February of 2014, Plaintiff reported that her pain was not controlled, despite her use of Tramadol (occasionally), Gabapentin, Meloxicam and a TENS unit (A.R. 1969). Dr. Tongbai continued Plaintiff's medications, cognitive behavioral therapy and physical therapy (A.R. 1972). On examination in July of 2014, Plaintiff reportedly had decreased range of motion in the lumbar spine with pain, right lower extremity sensory deficits, normal motor strength, positive straight leg raising tests, and fibromyalgia tender points (A.R. 2482-83). Dr. Tongbai observed that Plaintiff had failed conservative treatment measures, and Dr. Tongbai scheduled a lumbar spine epidural injection for August and continued Plaintiff's
///

cognitive behavioral therapy and physical therapy (A.R. 2484-85; see also A.R. 2493-94, 2549-62 (records for epidural injection)).

In April of 2016, Plaintiff returned, complaining of back pain with right lower extremity radiculopathy (A.R. 3431). On examination, she reportedly had decreased range of motion in the lumbar spine, lower extremity sensory deficits, and positive straight leg raising tests (A.R. 3435-36). Dr. Tongbai scheduled another epidural steroid injection (A.R. 3437).

Qualified Medical Examiner Dr. Randy Rosen prepared a pain management report dated January 20, 2016 (A.R. 3483-90). On examination, Plaintiff reportedly had an antalgic gait to the right and exacerbated heel-toe walk to the right, tenderness over the lumbar spine, positive piriformis tests on the right side, positive sacroiliac tests on the right side, sciatic nerve root tension on seated straight leg raising, limited range of motion in the lumbar spine, 4/5 lower extremity muscle testing on the right big toe extensors and right knee extensors, and 1/2 lower extremity reflexes in the right knee and left ankle (A.R. 3485-87). Dr. Rosen assessed lumbar disc disease, lumbar radiculopathy, right sacroiliac joint arthropathy, and right piriformis syndrome (A.R. 3487). Dr. Rosen requested approval for lumbar spine epidural injections and requested additional authorization for a sacroiliac joint injection (A.R. 3488). On June 4, 2016, Dr. Rosen gave Plaintiff a right sacroiliac joint injection (A.R. 3500-01).

///

///

1      **D.**   **Orthopedic Treatment Records**

2

3      Orthopedic surgeon Dr. Philip Sobol treated Plaintiff from June

4 of 2012 through at least September of 2014 (A.R. 982-94, 2056-71,

5 2818-28).  Plaintiff complained of stress, anxiety and pain in her

6 neck, shoulders, arms, back (radiating to the right leg), elbows,

7 forearms, wrists and hands (with numbness and tingling) (A.R. 983,

8 2819).  On initial examination in June of 2012, she reportedly had

9 cervical spine tenderness and spasm, localized neck pain on

10 compression, limited range of neck motion, tenderness of the thoracic

11 and lumbar spine, pain with straight leg raising, limited range of

12 back motion, tenderness in her shoulders, elbows, forearms, and wrist,

13 slight atrophy of the hypothenar pad of the left hand, positive

14 Cozen's, Reverse Cozen's, Tinel's, and Phalen's tests bilaterally, and

15 decreased sensation to pinprick and touch in the bilateral upper

16 extremities, but no motor weakness noted in the upper or lower

17 extremities (A.R. 986-89; <u>see also</u> A.R. 2059-62, 2820-23 (subsequent

18 examinations with similar findings)). In March of 2014, Plaintiff had

19 Jamar dynamometer grip strengths of 12/10/11 kg on the right and

20 18/17/18 kg on the left (A.R. 2062).  In September of 2014,

21 Plaintiff's Jamar dynamometer grip strength readings were 10/10/12 kg

22 on the right and 18/18/17 kg on the left (A.R. 2823).

23

24      In reviewing Plaintiff's medical history, Dr. Sobol noted that a

25 pain management specialist had requested authorization for lumbar

26 epidural steroid injections, but the insurance carrier had denied the

27 request (A.R. 2058-59, 2064).  Dr. Sobol reviewed Plaintiff's July,

28 ///

2013 lumbar spine MRI,[10] June 2013 elbow ultrasounds which were "normal," and August 2012 EMG/nerve conduction studies which also were "normal" (A.R. 2062-63; see also A.R. 2080 (June, 2013 elbow ultrasound)). As of March of 2014, Dr. Sobol diagnosed: (1) cervical musculoligamentous sprain/strain with bilateral upper extremity radiculitis, right greater than left; (2) thoracic musculoligamentous sprain/strain; (3) lumbar musculoligamentous sprain/strain with right lower extremity radiculitis, disc protrusions, and nerve impingement at L3-L4 and L4-L5 with annular tears at these levels per the July, 2013 MRI; (4) bilateral shoulder periscapular strain; (5) bilateral elbow medial and lateral epicondylitis; (6) bilateral wrist/forearm tendinitis; (7) psychiatric complaints; and (8) fibromyalgia syndrome (A.R. 2063; see also A.R. 989-90, 2824 (similar diagnoses from other dates)). Dr. Sobol considered Plaintiff "permanent and stationary" (A.R. 2065).

Dr. Sobol opined that Plaintiff would have the following work restrictions: (1) for her cervical spine, she would be precluded from prolonged positioning, repetitive flexion/extension motions, and heavy lifting; (2) for her lumbar spine, she would be precluded from heavy lifting and repetitive bending and stooping; (3) for her shoulders, she would be precluded from heavy lifting, repetitive/forceful pushing, pulling and repetitive overhead work; (4) for her elbows and

---

[10] The July, 2013 lumbar spine MRI showed: (1) scoliotic curvature; (2) a 3-mm right paracentral and right preforaminal disc protrusion at L3-L4 resulting in some abutment of the descending right L4 nerve root; (3) a 2-mm right preforaminal disc protrusion at L4-L5 with minimal abutment of the descending right L5 nerve root; and (4) posterior annular tear at L4-L5 and L3-L4 (A.R. 1733-34).

wrists, she would be precluded from heavy lifting, repetitive

flexion/extension motions, and strong gripping, grasping, and

squeezing (A.R. 2069; see also A.R. 2826 (finding similar restrictions

in September of 2014)).[11]


   Dr. Sobol completed a "Physical Capacities Evaluation" form dated

September 13, 2013 (A.R. 2414-15). Dr. Sobol opined that Plaintiff

could sit four to six hours per workday and stand/walk two to four

hours, alternating between sitting and standing (A.R. 2414). He

indicated that Plaintiff could use her hands for simple grasping, but

could not use her hands for "forceful" pushing and pulling, could not

use her hands for repetitive motion tasks, and she would be limited to

typing, using a mouse, and writing 15 minutes per hour (A.R. 2414).

Dr. Sobol opined that Plaintiff could occasionally carry up to 10

---

   [11]  While Dr. Sobol did not define what he meant by "heavy"
lifting, his progress reports during this time period suggest an
answer. From October of 2012 through June of 2014, Dr. Sobol or
his colleagues prepared monthly worker's compensation progress
reports recommending that Plaintiff be restricted to lifting no
more than 10 pounds, no forceful pushing or pulling with the
right and later left sides, only occasional typing and use of a
mouse, and later no repetitive or forceful gripping or prolonged
sitting or driving. See A.R. 1008, 1010, 1012, 1014, 1016, 1594,
1596, 1601, 2074, 2083-84, 2086-87, 2090-91, 2094-95, 2098-99,
2813. Plaintiff had continued to report tenderness and spasm in
her spine, shoulders, elbows, wrists, and decreased range of
motion in her shoulders and wrist (A.R. 1008, 1010, 1014, 1596,
1601, 2084, 2099). Dr. Sobol or his colleagues prepared progress
reports from October of 2014 through February of 2015 opining
that Plaintiff was 100 percent disabled (A.R. 2829, 2831, 2835;
compare A.R. 2718 (work status report from October of 2014 by Dr.
Joseph Faustgen opining that Plaintiff should be placed on
modified activity (i.e., standing intermittently up to 50 percent
of a shift, walking intermittently up to 50 percent of a shift,
with no squatting, kneeling or bending, and no lifting, carrying,
pushing, or pulling more than 10 pounds)).

pounds and frequently carry up to five pounds, had no postural restrictions, and could not do "prolonged" driving (A.R. 2415).

### E.    Neurology Treatment Records

Neurologist Dr. Tong Jiang treated Plaintiff from September of 2012 through at least May of 2015 (A.R. 615-19, 1653-57, 1901-04, 2344-47, 2456-59, 3135-38).[12]  Plaintiff complained of headaches with nausea and photophobia lasting two to three days, occurring more frequently two to three days before her period and improving afterward (A.R. 615-16).  She reported having one to two migraines per month (A.R. 616).  On examination, Plaintiff reportedly had neck pain, photophobia, myalgias, and anxiety (A.R. 618).  Dr. Jiang diagnosed migraines without aura and prescribed medication (A.R. 618-19).

In May of 2013, Plaintiff again reported the same number of headaches per month, and Dr. Jiang stated that Plaintiff's migraines were "in good control with Imitrex" (A.R. 1653-54, 1657).  In October of 2013, Plaintiff reported having stress and monthly migraines lasting two to three days (A.R. 1901).  Dr. Jiang assessed migraines and anxiety, continued Plaintiff's migraine medication, and referred her to behavioral medicine for her anxiety (A.R. 1904).  In May of 2014, Plaintiff reported having one to two migraines a month lasting two to three days (A.R. 2296, 2344).

---

[12]    Neurological testing from August 30, 2012, was essentially normal, showing "no electrical evidence" of radiculopathy, carpal tunnel syndrome, cubital tunnel syndrome, or peripheral neuropathy (A.R. 999-1006).

Dr. Jiang completed a headache form dated August 21, 2013 (A.R. 2416-17). Dr. Jiang indicated that Plaintiff has one to two headaches per month that last one to two days of "moderate" severity (i.e., "a significant handicap with sustained attention and concentration [which] would eliminate skilled work tasks") (A.R. 2416). At that time, Dr. Jiang stated that Plaintiff would miss two to four days of work per month due to her symptoms (A.R. 2417).

In June of 2014, Plaintiff reported she was having headaches three to four times per month (A.R. 2456). Dr. Jiang changed Plaintiff's medications and suggested Botox as a treatment option (A.R. 2459). Dr. Jiang completed another headache form dated July 31, 2014 (A.R. 2669-70). Dr. Jiang indicated Plaintiff was having three to four headaches per month lasting two days of "moderate" severity and that she had failed several medications (A.R. 2669). Dr. Jiang opined that Plaintiff's headaches would preclude her from competitive employment since the date Plaintiff last worked, and Dr. Jiang opined that, in 2014, Plaintiff would miss three days of work per month due to her symptoms (A.R. 2670).

Dr. Jiang completed a third headache form dated January 5, 2015 (A.R. 2776-77). Dr. Jiang then reported that Plaintiff was having 15 headache days per month lasting several hours to two to three days of moderate severity (A.R. 2776; see also A.R. 2766-72 (Plaintiff reporting in December of 2014 to a headache specialist that she was having 15 headache days per month)). Dr. Jiang again opined that Plaintiff's headaches preclude competitive employment (A.R. 2777). As ///

of 2015, Dr. Jiang reportedly believed that Plaintiff would miss three to four days of work per month due to her symptoms (A.R. 2777).

In May of 2015, Plaintiff returned to Dr. Jiang, reporting having four to five headaches a month lasting two to three days each (A.R. 3135). Plaintiff's neurological exam was normal and her prior CT scans did not show any abnormalities (A.R. 3138). An updated head CT scan from August, 2015 showed no abnormalities (A.R. 3215).

In September of 2015, Plaintiff presented to the West L.A. Headache Management Clinic for evaluation (A.R. 3270). She reported suffering daily headaches for the past one to two years (A.R. 3270). The report stated Plaintiff was "overusing" multiple analgesics, which may have been contributing to her headaches, and her treatment was complicated by "comorbidities of fibromyalgia and anxiety" (A.R. 3275). She was identified as a good candidate for treatment with Botox (A.R. 3275). She followed up later that month for Botox injections (A.R. 3285-91).

In December of 2015, Plaintiff returned to the Headache Management Clinic, stating that she had an approximately 50 percent reduction in headache frequency and intensity since her Botox treatment, and she had a few weeks with no headaches at all (A.R. 3368). Plaintiff was walking three times a week (A.R. 3368). Plaintiff was given more Botox (A.R. 3369). In April of 2016, Plaintiff returned to the Headache Management Clinic reporting definite improvement in her headaches (A.R. 3443). She reportedly had
///

six to eight headaches in the last month that were impairing (A.R. 3444). Plaintiff was given more Botox (A.R. 3444-45).

**II. Substantial Evidence Does Not Support the ALJ's Residual Functional Capacity Determination.**

The record is unclear on what (if any) medical source the ALJ relied in determining that Plaintiff retains the residual functional capacity for light work. <u>See</u> A.R. 23-34. The record does not contain any opinion from a consultative examiner. No treating or examining physician opined that Plaintiff retains such a capacity. To the contrary, every treating or examining physician who rendered an opinion on the subject indicated that Plaintiff is incapable of light work.

The ALJ may have relied on the non-examining state agency physician's opinion to determine Plaintiff's physical residual functional capacity, although the ALJ's decision does not mention this opinion. <u>See</u> A.R. 33 (ALJ's only mention of the state agency physicians' opinions relates to Plaintiff's mental limitations). A state agency physician rendered an opinion regarding Plaintiff's physical residual functional capacity on the basis of incomplete records that did not include the opinions of any treating source (A.R. 108-10).

The opinion of the non-examining state agency physician, which contradicts the treating physicians' opinions, cannot constitute substantial evidence to support the ALJ's decision. "The opinion of a

nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician <u>or</u> a treating physician." <u>Lester v. Chater</u>, 81 F.3d 821, 831 (9th Cir. 1995) (emphasis in original); <u>see also</u> <u>Orn v. Astrue</u>, 495 F.3d 625, 632 (9th Cir. 2007) ("When [a nontreating] physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the [nontreating] physician are not 'substantial evidence.'"); <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 n.4 (9th Cir. 1990) ("The nonexamining physicians' conclusion, with nothing more, does not constitute substantial evidence, particularly in view of the conflicting observations, opinions, and conclusions of an examining physician").

Thus, on the current record, substantial evidence does not support the ALJ's residual functional capacity determination.

**III. <u>The ALJ's Erred in the Evaluation of Medical Opinion Evidence.</u>**

In determining Plaintiff's physical residual functional capacity, the ALJ purportedly gave "little" weight to Dr. Salick's and Dr. Rao's opinions (A.R. 29-30). The ALJ asserted that these doctors' opinions were inconsistent with Plaintiff's daily activities and the medical evidence (A.R. 29-30). While the ALJ purported to give "considerable" weight to the opinion of Dr. Jiang, the ALJ rejected Dr. Jiang's 2015 opinion that Plaintiff then would be absent from work three or four days a month due to her migraines (A.R. 30). The ALJ did not mention ///

Dr. Jiang's earlier opinion that in 2013 Plaintiff would be absent from work two to four days a month (see A.R. 2417).[13]

A treating physician's conclusions "must be given substantial weight." Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988); see Rodriguez v. Bowen, 876 F.2d 759, 762 (9th Cir. 1989) ("the ALJ must give sufficient weight to the subjective aspects of a doctor's opinion. . . . This is especially true when the opinion is that of a treating physician") (citation omitted); see also Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (discussing deference owed to the opinions of treating and examining physicians). Even where the treating physician's opinions are contradicted, as here, "if the ALJ wishes to disregard the opinion[s] of the treating physician he . . . must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987) (citation, quotations and brackets omitted); see Rodriguez v. Bowen, 876 F.2d at 762 ("The ALJ may disregard the treating physician's opinion, but only by setting forth specific, legitimate reasons for doing so, and this decision must itself be based on substantial evidence") (citation and quotations omitted).

The reasons the ALJ stated for rejecting Dr. Salick's and Dr. Rao's opinions do not comport with these authorities. The ALJ stated that the lifting, carrying, and upper extremity limitations were inconsistent with Plaintiff's daily activities and "inconsistent with

---

[13]    The ALJ did not indicate what weight, if any, the ALJ gave to Dr. Pham-Bailey's opinions (A.R. 28-34).

the record," which assertedly showed a grip strength testing of 25
pounds on the right and 40 pounds on the left, "good" range of motion
in the upper extremities, and normal nerve conduction studies (A.R.
29-30).  The ALJ found there was "no evidence" to support the
standing, walking, and sitting limitations, because the lumbar spine
MRIs assertedly showed "mild pathology only," Plaintiff assertedly had
a normal gait, and Plaintiff assertedly had "good" range of motion in
her spine (A.R. 29-30).

    An ALJ properly may discount a treating physician's opinions that
are in conflict with treatment records or are unsupported by objective
clinical findings.  See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th
Cir. 2005) (conflict between treating physician's assessment and
clinical notes justifies rejection of assessment); Batson v.
Commissioner, 359 F.3d 1190, 1195 (9th Cir. 2004) ("an ALJ may
discredit treating physicians' opinions that are conclusory, brief,
and unsupported by the record as a whole . . . or by objective medical
findings"); Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003)
(treating physician's opinion properly rejected where physician's
treatment notes "provide no basis for the functional restrictions he
opined should be imposed on [the claimant]"); see also Rollins v.
Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ properly may reject
treating physician's opinions that "were so extreme as to be
implausible and were not supported by any findings made by any doctor
. . ."); 20 C.F.R. §§ 404.1527(c), 416.927(c) (factors to consider in
weighing treating source opinion include the supportability of the
opinion by medical signs and laboratory findings as well as the
opinion's consistency with the record as a whole).  A material

inconsistency between a treating physician's opinion and a claimant's admitted level of daily activities also can furnish a "specific, legitimate" reason for rejecting a treating physician's opinion.  See, e.g., Rollins v. Massanari, 261 F.3d at 856.  However, the ALJ's reliance on these stated reasons for rejecting Dr. Salick's and Dr. Rao's opinions lacks substantial supporting evidence in the record.

With regard to any alleged inconsistency between the treating physicians' opinions and the medical record, no doctor discerned any specific inconsistency.  The ALJ consulted no medical examiners or medical expert, and the state agency physicians reviewed no opinion evidence (A.R. 108).  The ALJ's lay discernment in this regard cannot constitute substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (an "ALJ cannot arbitrarily substitute his own judgment for competent medical opinion") (internal quotation marks and citation omitted); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is forbidden from making his or her own medical assessment beyond that demonstrated by the record).

For example, nowhere in the medical opinion evidence is grip strength deemed equivalent to or indicative of lifting or carrying capacity.  Indeed, some courts have rejected the ALJ's suggested relationship between grip strength and lifting or carrying capacity. See, e.g., Flynn v. Berryhill, 2018 WL 379012, at *4 (D. Haw. Jan. 11, 2018); Hope v. Astrue, 2011 WL 2135054, at *1 (C.D. Cal. May 31,

///

2011); <u>Bauslaugh v. Astrue</u>, 2010 WL 1875800, at *5 (C.D. Cal. May 11, 2010).

In any event, neither the ALJ nor this Court possesses the medical expertise to know whether a normal grip strength test is inconsistent with lifting, carrying, or other upper extremity limitations. The only record evidence is to the contrary. Both Drs. Salick and Sobol measured Plaintiff's grip strength (A.R. 859, 2062, 2823), and still opined that Plaintiff has lifting, carrying, and upper extremity limitations (A.R. 1610-11, 2069, 2414-15). All the treating physicians who opined regarding Plaintiff's abilities found that she is limited to lifting and carrying 10 pounds or less.

As discussed above, Plaintiff has, <u>inter alia</u>, documented fibromyalgia, neck, shoulder, and forearm strain, hand tendonitis, degenerative disc disease of the lumbar spine, and a disc bulge in her cervical spine, which have required multiple shoulder, elbow, and lumbar spine epidural injections. The ALJ did not address whether these conditions supported the limitations the doctors found. Without a medical source opinion to interpret the voluminous record evidence, the ALJ's lay inference from Plaintiff's grip strength testing results is not a legitimate reason to discount the treating physicians' opinions.

The ALJ's references to normal nerve conduction studies, the assertedly "mild" lumbar spine MRI showings, Plaintiff's assertedly normal gait, and "good" range of motion in her spine, also fail to constitute sufficient reasons for rejecting Dr. Salick's and Dr. Rao's

fibromyalgia-related opinions. Dr. Salick explained in detail that Plaintiff had all of the "classic" symptoms of fibromyalgia (A.R. 860-67, 2858-68). As the Ninth Circuit has recognized, "to date there are no laboratory tests to confirm the diagnosis [of fibromyalgia]." Benecke v. Barnhart, 379 F.3d 587, 590 (9th Cir. 2004); see also Revels v. Berryhill, 874 F.3d 648, 666 (9th Cir. 2017) (observing that fibromyalgia is diagnosed in part by evidence showing that another condition does not account for a patient's symptoms). Consequently, the lack of abnormal nerve conduction studies, the presence of assertedly "mild" MRI findings, and snapshot evaluations of Plaintiff's gait and range of motion (inconsistent with other snapshot evaluations), cannot properly impugn medical opinions regarding fibromyalgia. See Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2009) ("the musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities") (quoting Harrison's Principles of Internal Medicine at 2056 (16th ed. 2005)); McCormick v. Colvin, 2013 WL 3972700, at *15 (N.D. Iowa July 26, 2013), adopted, 2013 WL 4401853 (N.D. Iowa Aug. 14, 2013) ("Because [fibromyalgia] is a rheumatic disease, it is not diagnosed through the type of objective findings utilized with neurological orthopedic disorders. . . . In short, the fact that McCormick had relatively normal MRI findings and lacked other objective findings that would suggest neurological or orthopedic impairments does not provide a good reason for discounting Dr. Luft's opinions"); Reliford v. Barnhart, 444 F. Supp. 2d 1182, 1190-91 (N.D. Ala. 2006) ("Fibromyalgia is not diagnosed by MRI or x-rays. . . . The negative MRI and x-ray scans are meaningless in fibromyalgia cases"); Curtis v. Astrue, 623 F. Supp. 2d 957, 967 (S.D. Ind. 2009) ("The ALJ's

conclusion that Plaintiff's normal MRI and normal neurological results were inconsistent with her diagnosis of fibromyalgia misunderstands the nature of fibromyalgia"); cf. Coleman v. Astrue, 423 Fed. App'x 754, 755 (9th Cir. 2011) (holding that ALJ erred by "rel[ying] on the absence of objective physical symptoms of severe pain as a basis for disbelieving [claimant's] testimony regarding" effects of fibromyalgia symptoms).

With regard to the perceived inconsistency between the doctors' opinions and Plaintiff's admitted daily activities, no material inconsistency appears. The ALJ cited Plaintiff's asserted ability to bathe and dress independently, drive for short distances, do light household chores, and prepare meals (A.R. 29).[14] These activities are not necessarily inconsistent with an inability to lift more than 10 pounds or to sit, stand, or walk as required for a normal 40 hour

---

[14] Plaintiff's testimony suggests a declining ability to engage in these activities. Plaintiff testified at her first hearing in 2014 that she drove four to five times a week to doctor's appointments, physical therapy, and sometimes to pick up her kids (A.R. 80). At her second hearing in 2016, she said she drives very rarely and only if she does not have pain or migraines (A.R. 56). Plaintiff said she spends her days doing everything slowly, at her pace, and most of what she does is to manage her symptoms (A.R. 57-58, 64). She said she could bathe herself, but her husband helped her with dressing (A.R. 64, 87-88). She said she could microwave meals, but had difficulty cooking due to weakness in her hands (A.R. 64). Her husband or her mother or sister reportedly prepared meals (A.R. 88, 90). Plaintiff said she did not clean her house; she said others in the house cleaned it (A.R. 65, 89-90). According to Plaintiff, on days when she was not having body aches and migraines, she could use a computer to check for appointments, go with her husband to doctor appointments or to church, pay bills, fold clothes, put dishes in a dishwasher, set the table, and dust (A.R. 58, 65, 89-90).

work week.  See Diedrich v. Berryhill, 874 F.3d 634, 642-43 (9th Cir. 2017); Vertigan v. Halter, 260 F.3d 1044, 1049-50 (9th Cir. 2001).

Finally, the Court observes that the ALJ did not adequately explain whether the ALJ considered Dr. Jiang's 2013 opinion that Plaintiff then would be absent from work two or more days per month (A.R. 2417).  The vocational expert had testified at the first administrative hearing that, if a person missed as few as two days of work, the person would be precluded from competitive employment (A.R. 98-99).  The ALJ should have addressed this issue in his decision.[15]

## IV. The Court is Unable to Deem the Errors Harmless; Remand for Further Administrative Proceedings is Appropriate.

The Court is unable to conclude that the ALJ's several errors were harmless.  See Marsh v. Colvin, 792 F.3d 1170, 1173 (9th Cir. 2015) (even though the district court had stated "persuasive reasons" why the ALJ's failure to mention the treating physician's opinion was harmless, the Ninth Circuit remanded because "we cannot 'confidently conclude' that the error was harmless"); Treichler v. Commissioner, 775 F.3d 1090, 1105 (9th Cir. 2014) ("Where, as in this case, an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency"); see also Molina

---

[15]    One might speculate that the ALJ likely thought no more highly of Dr. Jiang's 2013 opinion than of Dr. Jiang's 2014-15 opinions.  The Court cannot base a ruling on such speculation, however.  See Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981) (citation omitted); Ros v. Berryhill, 2017 WL 896287, at *4 (E.D. Cal. March 7, 2017).

v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012) (an error "is harmless where it is inconsequential to the ultimate non-disability determination") (citations and quotations omitted); McLeod v. Astrue, 640 F.3d 881, 887 (9th Cir. 2011) (error not harmless where "the reviewing court can determine from the 'circumstances of the case' that further administrative review is needed to determine whether there was prejudice from the error").

Remand is appropriate because the circumstances of this case suggest that further administrative review could remedy the ALJ's errors. McLeod v. Astrue, 640 F.3d at 888; see also INS v. Ventura, 537 U.S. 12, 16 (2002) (upon reversal of an administrative determination, the proper course is remand for additional agency investigation or explanation, except in rare circumstances); Dominguez v. Colvin, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits"); Treichler v. Commissioner, 775 F.3d at 1101 n.5 (remand for further administrative proceedings is the proper remedy "in all but the rarest cases"); Garrison v. Colvin, 759 F.3d at 1020 (court will credit-as-true medical opinion evidence only where, inter alia, "the record has been fully developed and further administrative proceedings would serve no useful purpose"); Harman v. Apfel, 211 F.3d 1172, 1180-81 (9th Cir.), cert. denied, 531 U.S. 1038 (2000) (remand for further proceedings rather than for the immediate payment of benefits is appropriate where there are "sufficient unanswered questions in the record"). There remain significant unanswered questions in the present record. Cf. Marsh v. Colvin, 792 F.3d at

1173 (remanding for further administrative proceedings to allow the ALJ to "comment on" the treating physician's opinion).

**CONCLUSION**

For all of the foregoing reasons,[16] Plaintiff's and Defendant's motions for summary judgment are denied and this matter is remanded for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: April 26, 2018

_____
/S/
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

---

[16]     The Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time.